UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL A. R.,[1]<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of Social Security,<br><br>    Defendant. | Case No. 5:21-cv-00176-JC<br><br>MEMORANDUM OPINION AND ORDER OF REMAND |

## I.  SUMMARY

On January 31, 2021, plaintiff filed a Complaint seeking review of the Commissioner of Social Security's denial of plaintiff's application for benefits. The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion") (collectively "Motions").  The Court has taken the Motions under submission

---

[1] Plaintiff's name is partially redacted to protect his privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1 without oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; July 15, 2021 Case
2 Management Order ¶ 5.

3     Based on the record as a whole and the applicable law, the decision of the
4 Commissioner is REVERSED AND REMANDED for further proceedings
5 consistent with this Memorandum Opinion and Order of Remand.

6 **II.     BACKGROUND AND SUMMARY OF ADMINISTRATIVE**
7 **DECISION**

8     On August 17, 2018, plaintiff filed an application for Disability Insurance
9 Benefits, alleging disability beginning on September 25, 2017, due to "TIA"
10 (transient ischemic attack), stroke, occluded vertebral artery, and a compressed
11 cervical disc.  (Administrative Record ("AR") 181-82, 224).  An Administrative
12 Law Judge ("ALJ") subsequently examined the medical record and heard
13 testimony from plaintiff (who was represented by counsel) and a vocational expert.
14 (AR 15-27, 33-64).

15     On June 26, 2020, the ALJ determined that plaintiff was not disabled
16 through the date of the decision.  (AR 15-27).  Specifically, the ALJ found:
17 (1) plaintiff suffered from the following severe impairments:  status post TIAs in
18 September 2017 and April 2018, hypertension, cervical spine herniated disc and
19 cervical degenerative disc disease (AR 18); (2) plaintiff's impairments, considered
20 individually or in combination, did not meet or medically equal a listed impairment
21 (AR 18); (3) plaintiff retained the residual functional capacity to perform medium
22 work (20 C.F.R. § 404.1567(c)) with additional limitations[2] (AR 18-26 (adopting
23 capacity consistent with available medical opinions at AR 71-73, 83-85, 979-80
24 about what plaintiff can do despite his impairments (20 C.F.R. § 1513(a)(2)),

---

[2] The ALJ determined that plaintiff would be limited to:  (1) frequent bilateral upper extremity pushing and/or pulling, and frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; (2) no climbing of ladders, ropes or scaffolds; and (3) no work around hazards such as dangerous, moving machinery and unprotected heights.  (AR 18-19).

1  which the ALJ found were "partially persuasive")[3]); (4) plaintiff could perform his
2  past relevant work as a Public Safety Dispatcher (DOT 379.362-010, sedentary,
3  semi-skilled work) (AR 26 (adopting vocational expert testimony at 59-60)[4]); and
4  (5) plaintiff's statements regarding the intensity, persistence, and limiting effects of
5  subjective symptoms were not entirely consistent with the medical evidence and
6  other evidence in the record (AR 20-26).

   On December 15, 2020, the Appeals Council denied plaintiff's application
   for review. (AR 1-3).

## III.   APPLICABLE LEGAL STANDARDS

### A.   Administrative Evaluation of Disability Claims

To qualify for disability benefits, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable

---

[3]For claims filed after March 27, 2017 (such as plaintiff's present claim), new regulations govern the evaluation of medical opinion evidence. Under these regulations, ALJs no longer "weigh" medical opinions; rather, ALJs determine which opinions are the most "persuasive" by focusing on several factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of treatment, frequency of examinations, purpose of treatment, extent of treatment, whether the medical source examined the claimant); (4) the medical source's specialty; and (5) "other" factors. See 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). ALJs must explain how they considered the factors of supportability and consistency, but need not explain how they considered any other factor. See 20 C.F.R. §§ 404.1520c(b), 416.920c(b); Woods v. Kijakazi, 32 F.4th 785, 791-92 (9th Cir. 2022) (discussing evaluation of opinion evidence under the new regulations).

The new regulations command that an opinion that a claimant is disabled or not able to work is "inherently neither valuable nor persuasive," and an ALJ need not provide any analysis about how such evidence is considered. See 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3). An ALJ is only required to provide an analysis of "medical opinions," which are statements from medical sources about what a claimant can still do despite their impairments, and whether they have impairment-related limitations or restrictions on their ability to perform physical or mental demands of work activities. See 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

[4]The vocational expert testified that if a person were off task five percent of the time (*i.e.*, for 24 minutes a day), it would eliminate the ability to perform plaintiff's past relevant work and all other competitive work. (AR 60).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606 (9th Cir. 2020); 20 C.F.R. §§ 404.1505(a), 416.905. To be considered disabled, a claimant must have an impairment of such severity that he is incapable of performing work the claimant previously performed ("past relevant work") as well as any other "work which exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

To assess whether a claimant is disabled, an ALJ is required to use the five-step sequential evaluation process set forth in Social Security regulations. See Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof at steps one through four – i.e., determination of whether the claimant was engaging in substantial gainful activity (step 1), has a sufficiently severe impairment (step 2), has an impairment or combination of impairments that meets or medically equals one of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and retains the residual functional capacity to perform past relevant work (step 4). Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). The Commissioner has the burden of proof at step five – i.e., establishing that the claimant could perform other work in the national economy. Id. "If the ALJ determines that a claimant is either disabled or not disabled at any step in the process, the ALJ does not continue on to the next step." Bray v. Commissioner of Social Security Administration, 554 F.3d 1219, 1222 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(a)(4)).

///

### B. Federal Court Review of Social Security Disability Decisions

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record." 42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted). The standard of review in disability cases is "highly deferential." Rounds v. Commissioner of Social Security Administration, 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted). An ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision. Trevizo, 871 F.3d at 674-75 (citations omitted). Even when an ALJ's decision contains error, it must be affirmed if the error was harmless. See Treichler v. Commissioner of Social Security Administration, 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted). When determining whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely." Trevizo, 871 F.3d at 675 (citations omitted). Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

A reviewing court may not conclude that an error was harmless based on independent findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations omitted). When a reviewing court cannot confidently conclude that an error was harmless, a remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

**IV.   DISCUSSION**

Plaintiff contends, *inter alia*, that the ALJ erred in assessing the medical evidence and plaintiff's subjective allegations regarding cognitive limitations plaintiff has had following his TIAs, which plaintiff asserts preclude performance of his past relevant work. See Plaintiff's Motion at 4, 14-20. On the available record, the ALJ erred in evaluating plaintiff's subjective allegations. Since the Court cannot find that the ALJ's error was harmless, a remand is warranted.

**A.   Summary of the Relevant Medical Record**

The medical record reflects that plaintiff was in car accidents in June and July 2017, after which plaintiff was diagnosed with vertebral artery dissection which led to plaintiff suffering TIAs in September 2017 – around the time of the alleged onset date – and April 2018. See AR 288 (summarizing major medical history), 718-25 (records following June, 2017 motor vehicle accident resulting in neck, back, and abdominal pain assessed as cervicalgia, left shoulder pain, thoracic spine pain, lumbar radiculopathy, hip strain and abdominal discomfort); see also AR 304-33 (hospital records for September, 2017 TIA reflecting right-sided numbness, facial asymmetry, slurred speech, right vertebral artery dissection per MRA/CT angiogram of the neck, with a reported history of about nine episodes but emergency treatment only three times (not reflected in the available record); mental status reportedly was within normal limits); AR 347-74 (hospital records for April, 2018 TIA reflecting worsening symptoms of lightheadedness and dizziness with focal motor weakness, double vision while driving, fatigue, right side numbness,

trouble pronouncing words for the last few months, and persistent symptoms since the September, 2017 TIA)). A brain MRI at the time of the September 2017 TIA was normal. (AR 309-10). Imaging at the time of the April, 2018 TIA was largely unremarkable and unchanged from prior studies. (AR 351-52, 366).

As detailed below, the record reflects complaints of dizziness and cognitive issues to various treatment providers and to the reviewing physicians following plaintiff's TIAs, but there are no specific examination findings supporting plaintiff's alleged cognitive issues.

### 1. Family Practitioner Dr. Steven Luh

Family practitioner Dr. Steven Luh treated plaintiff primarily with pain medication from March 2017 through at least January 2019. (AR 856-928, 988-95). Throughout this time, Dr. Luh reported that plaintiff was oriented and his remote and recent memory were not impaired to general conversation, despite some noted complaints of disorientation, disorganization, vision change with difficulty focusing, forgetfulness, confusion, and difficulty concentrating since plaintiff's June 2017 car accident. (AR 858-59, 863, 868-70, 872, 876-77, 881, 883, 885, 888, 891, 893, 895, 897, 901-03, 905, 907, 909, 910, 912, 915, 917, 919, 921-22, 927, 988, 991, 995). Dr. Luh reportedly completed disability forms for plaintiff on November 16, 2017, April 18, 2018, June 6, 2018, and January 24, 2019, with the last covering a disability period through May 24, 2019, but neither the forms nor any detail regarding these forms are in the record. (AR 878, 880, 881, 883, 904, 906, 998, 991).[5]

### 2. Vascular Surgeon Dr. Hugh Gelabert

Vascular surgeon Dr. Hugh Gelabert evaluated plaintiff in May 2018 for, *inter alia*, double vision, headaches, coordination problems, and lightheadedness

---

[5] At subsequent pain management treatment visits with Pain Management Associates of Fountain Valley in late 2019 and early 2020, plaintiff continued to complain sometimes of memory issues and dizziness. (AR 1250, 1262, 1266, 1268, 1270).

during exertion. (AR 288). Dr. Gelabert noted from imaging that it was unclear whether plaintiff had suffered TIAs versus strokes – plaintiff's symptomatology with persistent deficits suggested stroke, so Dr. Gelabert referred plaintiff to a neurologist for a second opinion. (AR 289). Dr. Gelabert reportedly discussed with plaintiff that plaintiff should not operate a motor vehicle given his history of dizziness attacks. (AR 289).

### 3. Neurologist Dr. Victor Bach Doan

Neurologist Dr. Victor Bach Doan evaluated plaintiff later in May 2018, for complaints of continued intermittent lightheadedness for the last year, and prior reports of fatigue, insomnia, and diminished finger dexterity while typing. (AR 379-80). Physical examination was within normal limits, but did not include any measures of plaintiff's mental limitations beyond noting that plaintiff was alert and oriented with normal speech and language. (AR 381). Dr. Doan noted plaintiff's persistent lightheadness seemed "discordant" with imaging findings. (AR 381). Dr. Doan referred plaintiff to an ear nose and throat specialist and audiology for evaluation. (AR 382).

Plaintiff returned to Dr. Doan in August 2018, reporting persistent "episodes of nonspecific symptoms" (*i.e.*, brain fog, "fuzzy feeling" with lightheadedness, nonpositional vertigo, decreased bilateral finger dexterity, and not feeling well) five days out of a week since his initial TIA hospitalization in September 2017. (AR 393). Physical examination findings were unchanged from the prior visit. (AR 395). Dr. Doan noted plaintiff might need a second opinion from a vascular neurologist. (AR 396).

### 4. Primary Provider Dr. Todd Peters

Primary provider Dr. Todd Peters examined plaintiff in August and November 2018, for complaints of neck pain with dizziness, instability, leg weakness, double vision and sight difficulty. (AR 982, 985). Dr. Peters diagnosed cervicalgia with cervical neuropathy per MRI. (AR 985). At a follow up visit in

August 2019, plaintiff complained of cognitive and vision issues, which Dr. Peters noted were not due to plaintiff's cervical disc bulge. (AR 1245). Dr. Peters referred plaintiff for neurology and testing for cognitive issues. (AR 1245; see also AR 1433-37 (treatment note for a family practice provider from August 2019, noting plaintiff complained of persistent brain fog with difficulty concentrating and thinking for which plaintiff also was referred to neurology for evaluation for cognitive and behavioral changes)).

### 5. Neurologist Dr. Bruce Cleeremans

Neurologist Dr. Bruce Cleeremans evaluated plaintiff in September 2019, for complaints of right head pain, fatigue, dizziness, unsteadiness, foggy concentration, and memory loss (primarily with auditory memory – which plaintiff reported prevented him from working his job as a 911 operator because that job is all auditory, and requires rapid response to situations and communication with police officers) since plaintiff's TIA in September 2017. (AR 1275-77). Mental status examination reported that plaintiff was alert and oriented, his remote and recent memory were intact, his attention and concentration were preserved, he had normal speech output and understanding, and his fund of knowledge and vocabulary were normal. (AR 1276). Notwithstanding these findings, Dr. Cleeremans diagnosed persistent verbal memory difficulty. (AR 1277). Dr. Cleeremans explained that plaintiff's memory had improved "quite a bit" since his injury, but plaintiff still had residual symptoms along with unsteadiness and headaches. (AR 1277). Dr. Cleeremans concluded:

> The memory and some of the unsteadiness symptoms are permanent residuals from that event after the motor vehicle accident. His [sic] sounds like it will prevent him from returning to work as a 911 operator that [sic] he might be able to do other activities that are less speed intensive.

(AR 1277). Plaintiff followed up with Dr. Cleeremans in February 2020, reporting

continued symptoms. (AR 1278-80). Mental status examination findings were the same as the prior visit. (AR 1279). Dr. Cleeremans repeated his explanation and prior conclusion about plaintiff's apparent inability to do his past work. (AR 1280).

### 6.     Neurosurgeon Dr. Jeffrey Gross

Neurosurgeon Dr. Jeffrey Gross evaluated plaintiff, reviewed medical records, and prepared several reports concerning plaintiff's condition that are dated from October 2017 through February 2020. See AR 726-37, 1015-19, 1047-1107, 1174-80, 1360-63, 1371-1432 (various reports). As pertinent to plaintiff's cognitive complaints, Dr. Gross prepared a follow up consultation report in March 2019. (AR 1099-1107). He had not seen plaintiff since September 2017. (AR 1099). Dr. Gross noted that since plaintiff's last visit, plaintiff had suffered two TIAs which reportedly caused mental fogginess after the second TIA in March [sic] 2018. (AR 1099). Plaintiff reportedly had applied for disability on the basis of cognitive issues but been denied and currently was appealing the denial. (AR 1099). Dr. Gross generally stated, "He has not been able to work since." (AR 1099).

> Dr. Gross reported:
> He has persistent fogginess. He feels to be fuzzy and in a mental
>    haze. He has trouble with concentration and focus. He can have
>    trouble forming words of [sic] finishing sentences. Memory is
>    limited. Driving is restricted (self-imposed).

(AR 1100). However, Dr. Gross's examination did not note any evaluation of plaintiff's alleged cognitive issues. (AR 1100-03). Dr. Gross reviewed March 2019 brain MRI and MRA studies which showed a cavum septum pellicidum and thinned right vertebral artery. (AR 1106; see also AR 1133 ( March 2019 brain MR angiogram showed irregular and diminutive intracranial right vertebral artery and otherwise unremarkable findings), 1138 (March 2019 unremarkable brain

MRI)). Dr. Gross noted some improvement in plaintiff's previously diagnosed injuries, and diagnosed right vertebral artery dissection with ischemic events with mesencephalopathy (occular and vestibular residuals), occluded on anti-coagulants, and permanent cognitive residuals. V(AR 1106-07). Dr. Gross did not opine re any specific limitations plaintiff may have, but reported plaintiff's disability status as "total disability." (AR 1107).

Dr. Gross prepared a follow up consultation report in November 2019. (AR 1383-1401). Dr. Gross had not seen plaintiff since March 2019. (AR 1383). Plaintiff complained of, *inter alia*, persistent and constant dizziness, problems with visual acuity and double vision from prolonged reading, and short term memory problems. (AR 1384). Examination showed dizziness with neck movement, but did not include any evaluation of plaintiff's alleged visual or memory issues. (AR 1384-88). Dr. Gross nonetheless opined as he did before that plaintiff's cognitive limitations were permanent and that plaintiff had "total disability." (AR 1400-01).

Dr. Gross prepared a telephonic follow up consultation in February 2020. (AR 1420-26). Plaintiff complained of frustration, depression, ongoing dizziness, fatigue, trouble with visual focusing, residual short term memory problems, and dropping things from his right arm, but no residual speech problems. (AR 1420). Dr. Gross did not examine plaintiff given that the consultation was by telephone, but again opined plaintiff had "total disability." (AR 1421, 1425).

### 7. Consultative Examiner Dr. Azizollah Karamlou and the State Agency Physicians

Dr. Azizollah Karamlou examined plaintiff and prepared an internal medicine consultation dated November 9, 2018. (AR 976-80). Dr. Karamlou reviewed no medical records. (AR 979). Plaintiff complained of persistent brain fog, poor attention and concentration following his TIAs. (AR 976, 979). Dr. Karamlou did not evaluate plaintiff's alleged cognition issues as part of his examination, but Dr. Karamlou did find that plaintiff has brain fog and poor

attention/concentration related to his TIAs. (AR 977-79). Dr. Karamlou opined that plaintiff would be capable of performing a range of medium work, but did not opine whether plaintiff would have any mental limits. (AR 979-80).

State agency physicians reviewed the record in November 2018 and April 2019, which then included Dr. Karamlou's opinion and plaintiff's complaints of brain fog, and poor attention and concentration due to TIAs, but did not include any treatment records from Drs. Cleeremans or Gross. (AR 66-88). The state agency physicians adopted Dr. Karamlou's medium residual functional capacity assessment. (AR 70-73, 83-85 (noting there was no evidence of significant residual neurological deficits from plaintiff's TIAs)).

### B. Summary of Plaintiff's Testimony and Statements

Plaintiff testified that his work as a public safety dispatcher for the Long Beach Police Department required that he answer 911 calls as well as calls to the normal police number, put medical emergency calls through to the fire department, and otherwise radio dispatch calls for police response, all while communicating with police units "in the fields." (AR 39-40). Plaintiff's job was computer based and involved dispatch and mapping systems. (AR 40). Plaintiff said he stopped working after he had his second "TIA stroke" because he was never able to recover "enough" to return to work. (AR 40-41). Plaintiff explained that he had balance issues, constant dizziness, limited finger dexterity, eyesight issues (*i.e.*, trouble keeping his eyes in focus, and difficulty judging depth), and fatigue from standing due to balance issues. (AR 40-43). Plaintiff said his short term memory is quite poor (*e.g.*, he has trouble remembering if he has taken his medications and needs reminders), and he has found it "exceptionally difficult" to focus on tasks after his second TIA, such as getting caught up on banking or balancing his checkbook. (AR 48, 50-51).

Plaintiff estimated that he could stand for up to 15 minutes before needing to sit down due to fatigue and feeling like he is going to fall. (AR 43). Plaintiff had

fallen in January 2018, when he returned to work the after his first stroke. (AR 43-44; see also AR 897 (treatment note reporting fall dated January 15, 2018)). He had not fallen since then because he had not pushed himself to the point where he would fall. (AR 44). Plaintiff estimated that he stands for a total of one hour per day, and the rest of the day he is sitting reclined in a neutral position or lying down. (AR 44). He estimated he spends 20 minutes a day in a directly upright position (*e.g.*, when he is seated at the dinner table). (AR 45). Plaintiff said if he sits upright for any "great" length of time, he will have neck spasms. (AR 45-46). Plaintiff did daily stretches at home for about 20 minutes to try to alleviate his discomfort. (AR 46). Plaintiff said that nothing helped with his dizziness – it was due to permanent brain damage. (AR 46-47).

Plaintiff lived with his wife who also was injured in plaintiff's July 2017 car accident, requiring that she undergo emergency neck surgery for her cervical spine which had failed. (AR 49). Plaintiff's wife could barely stand and her cervical spine was not strong enough to hold her head up. (AR 49). She could not do any household chores. (AR 49). Plaintiff said he could do sweeping and mopping for 30 to 40 minutes at a time before getting fatigued/increasingly dizzy, but he does not do any household chores on days when his dizziness is intense, which he said happens two to three times a week. (AR 49-50).

Plaintiff said he could cook on occasion, maybe once or twice a month, and that he and his wife were getting most of their meals delivered. (AR 56). He said his wife stays in bed all day and he will bring her food or a drink when she needs one. (AR 56). As for his finances, plaintiff said most everything is set up on auto pay so he does not require hours to manage his accounts. (AR 56-57). Plaintiff did watch some television during the day. (AR 57).

Plaintiff said he stopped driving after his second stroke because of his depth perception issues. (AR 51-52). On further questioning, plaintiff clarified that he drives himself to doctor's appointments but his wife goes with him and acts as a

second set of eyes. (AR 52).[6] Plaintiff said he had trouble reading from a screen because his eyes "start floating" causing him to lose his place "constantly," requiring him to look away for a couple minutes. (AR 53). His eyes go crossed again in only a "couple minutes," and this issue is persistent throughout the day. (AR 53).

Plaintiff had reported in a September 2018 Exertion Questionnaire that his vertigo made it not safe for him to drive and rendered him a fall risk. (AR 237-39). He reported that on a good day he does dishes, laundry, and miscellaneous "things" about the house accumulated from bad days. (AR 237). He also feeds pets and assists his wife the best he can. (AR 237). He reported that he could walk a couple hundred feet, does not feel stable, and has to walk slowly. (AR 237). He could climb 16 stairs in his house with the assistance of his Great Dane walking beside him, lift a gallon of milk, and carry groceries 20 feet. (AR 238). He reportedly did not do his own grocery shopping (he had them delivered) or clean his house. (AR 238-39). He reported that he could drive a car if his wife is with him to help with his depth perception issues. (AR 238). He reported he could stand for 15 minutes before needing to sit due to instability. (AR 239). He would sit or lie down six to eight times a day and took several hours to "level out." (AR 239).

### C. Pertinent Law

When determining disability, an ALJ is required to consider a claimant's impairment-related pain and other subjective symptoms at each step of the sequential evaluation process. 20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d). Accordingly, when a claimant presents "objective medical evidence of an underlying impairment which might reasonably produce the pain or other

---

[6]There are other suggestions in the record that plaintiff continued to drive himself albeit with some difficulty judging distances. (AR 1078, 1080). For example, plaintiff reportedly drove himself to an April 11, 2018 doctor appointment notwithstanding his recent hospital visit for TIA/stroke. (AR 885).

symptoms [the claimant] alleged," the ALJ is required to determine the extent to which the claimant's statements regarding the intensity, persistence, and limiting effects of his or her subjective symptoms ("subjective statements" or "subjective complaints") are consistent with the record evidence as a whole and, consequently, whether any of the individual's symptom-related functional limitations and restrictions are likely to reduce the claimant's capacity to perform work-related activities. 20 C.F.R. §§ 404.1529(a), (c)(4), 416.929(a), (c)(4); Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *4-*10.[7]

When an individual's subjective statements are inconsistent with other evidence in the record, an ALJ may give less weight to such statements and, in turn, find that the individual's symptoms are less likely to reduce the claimant's capacity to perform work-related activities. See SSR 16-3p, 2017 WL 5180304, at *8. In such cases, when there is no affirmative finding of malingering, an ALJ may "reject" or give less weight to the individual's subjective statements "only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter, 806 F.3d at 488-89. This requirement is very difficult to satisfy. See Trevizo, 871 F.3d at 678 ("The clear and convincing standard is the most demanding required in Social Security cases.") (citation and quotation marks omitted).

An ALJ's decision "must contain specific reasons" supported by substantial evidence in the record for giving less weight to a claimant's statements. SSR 16-3p, 2017 WL 5180304, at *10. An ALJ must clearly identify each subjective statement being rejected and the particular evidence in the record which purportedly undermines the statement. Treichler, 775 F.3d at 1103 (citation

---

[7]Social Security Ruling 16-3p superseded SSR 96-7p and, in part, eliminated use of the term "credibility" from SSA "sub-regulatory policy[]" in order to "clarify that subjective symptom evaluation is not an examination of an individual's [overall character or truthfulness] . . . [and] more closely follow [SSA] regulatory language regarding symptom evaluation." See SSR 16-3p, 2017 WL 5180304, at *1-*2, *10-*11.

15

omitted). "General findings are insufficient[.]" Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citations omitted).

If an ALJ's evaluation of a claimant's statements is reasonable and is supported by substantial evidence, it is not the court's role to second-guess it. See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted). When an ALJ fails properly to discuss a claimant's subjective complaints, however, the error may not be considered harmless "unless [the Court] can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout, 454 F.3d at 1056; see also Brown-Hunter, 806 F.3d at 492 (ALJ's erroneous failure to specify reasons for rejecting claimant testimony "will usually not be harmless").

### D. Analysis

In determining plaintiff's residual functional capacity for a range of medium work, the ALJ summarized plaintiff's testimony and statements and the related medical record. (AR 19-24). As noted above, the ALJ generally concluded that although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record, for the reasons explained in this decision." (AR 20). The ALJ generally found that "the objective medical evidence of record supports that no additional limitations are needed." (AR 23).

With respect to plaintiff's alleged neurological deficits, the ALJ noted that plaintiff reportedly had been alert and fully oriented with intact comprehension, normal memory, and normal speech with no dysarthria. See AR 23 (citing AR 289 (Dr. Gelabert's May 2018 treatment note), 318 (September 2017 hospital note reporting alert and oriented mental status with normal speech and language), 361 (April 2018 hospital note reporting same), 1121 (February 2019 treatment note

reporting same), 1279 (Dr. Cleeremans's February 2020 treatment note reporting same and that plaintiff's memory was intact and attention and concentration were preserved). The ALJ also found that plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms" were "inconsistent because [plaintiff] is not as restricted as he claims" based on plaintiff's "somewhat normal level of daily activity and interaction" (*e.g.*, "attending to his personal hygiene, light housekeeping, caring for a pet, managing his finances, driving and assisting his wife." (AR 23).

The ALJ's reasoning for discounting plaintiff's subjective statements and testimony is inadequate. Turning first to plaintiff's alleged daily activities, it is not clear how plaintiff's limited household chores of doing dishes, laundry, sweeping and mopping for up to 40 minutes at a time, and miscellaneous "things" about the house accumulated from bad days – which he testified he does not do two to three days a week when his dizziness is intense – along with feeding pets, limited driving to doctor's appointments with his wife's assistance, occasional cooking twice a month, bringing food and drinks to his wife who is in bed, lying down, reclining, watching some television, limited reading, and reviewing his finances (which mostly are on auto pay), conflict with any of his alleged limitations, including dizziness, limited short term memory and difficulty focusing on tasks following his TIAs. On the present record, plaintiff's reportedly limited daily activities are not a specific, clear and convincing basis to discount his subjective statements. See Revels v. Berryhill, 874 F.3d 648, 667 (9th Cir. 2017) ("Though *inconsistent* daily activities may provide justification for rejecting symptom testimony, 'the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from [the claimant's] credibility as to . . . overall disability.'") (emphasis added) (quoting Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004)); Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily

activities does not in any way detract from her credibility as to her overall disability.") (citation and alterations omitted); Reddick, 157 F.3d at 722 ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").[8]

The ALJ's other reason for discounting plaintiff's testimony and statements concerning his mental limitations, *i.e.*, a lack of support or inconsistency with the medical record, is also not clear and convincing. Direct contradiction between a claimant's asserted limitation and specific medical records reflecting an absence of that same asserted limitation may be particularly probative of a claimant's credibility. See Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir. 2022) (although the claimant asserted an inability to ambulate without a walker, medical records proved the contrary); see also Carmickle v. Commissioner, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony"); compare Burch, 400 F.3d at 681 (ALJ may not reject a claimant's subjective complaints "based solely on a lack of medical evidence to fully corroborate the alleged severity of pain"); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) ("subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence"). Here, there arguably is some contradiction between plaintiff's allegedly limited short term memory, disorientation, confusion, communication, and concentration issues, and the snapshot observations in the record that plaintiff was oriented, his memory was not impaired to general conversation or otherwise

---

[8] Defendant points to plaintiff's testimony that he could assist his wife who was limited in what she could do, but does not acknowledge *how* plaintiff explained he assisted his wife (by bringing food and drink to her in bed) and similarly points to plaintiff's testimony that he was able to manage finances without serious issues, without acknowledging that plaintiff said most of his bills are on auto pay. Compare Defendant's Motion at 5-6 with AR 56-57. The testimony to which Defendant points does not alter this Court's conclusion that plaintiff's reportedly limited daily activities are not a specific, clear and convincing basis to discount his subjective statements.

18

was intact, and his attention and concentration were preserved. See AR 858-59, 863, 868-70, 872, 876-77, 881, 883, 885, 888, 891, 893, 895, 897, 901-03, 905, 907, 909, 910, 912, 915, 917, 919, 921-22, 927, 988, 991, 995 (Dr. Luh's observations of unimpaired memory to general conversation); AR 381, 395 (Dr. Doan's notations that plaintiff was alert and oriented with normal speech and language); AR 1276, 1279 (Dr. Cleereman's findings that plaintiff's remote and recent memory were intact, his attention and concentration were preserved, he had normal speech output and understanding, and his fund of knowledge and vocabulary were normal). However, as detailed above, notwithstanding these findings, Dr. Cleeremans reported that plaintiff's memory had improved "quite a bit" since his injury, but he still had permanent residual symptoms along with unsteadiness and headaches. (AR 1277). Dr. Gross also reported plaintiff's persistent brain fog, limited memory, difficulty concentrating and focusing, and trouble forming words and sentences. (AR 1100, 1400)

       The cursory observations about plaintiff's orientation, memory, attention and concentration, without more detailed or specialty testing, do not undermine plaintiff's subjective statements and testimony that he has permanent cognitive difficulties following his TIAs. See Smartt, 53 F.4th at 495 (citing Burch, 400 F.3d at 681, "an ALJ cannot effectively render a claimant's subjective symptom testimony superfluous by demanding positive medical evidence 'fully corroborat[ing]' every allegation within the subjective testimony"). In particular, there were no detailed evaluations in the record specifically addressing plaintiff's alleged cognitive issues which his neurologists have said are permanent.

       The Court observes that the infirmity of one or two stated reasons for an ALJ's discounting of a claimant's testimony or statements does not always require the overturning of that determination. See Carmickle, 533 F.3d at 1162. In the present case, all of the ALJ's reasoning is infirm on the present record. Given the vocational expert's testimony that if a person were off task five percent of the time

19

(*i.e.*, for 24 minutes a day), it would eliminate the ability to perform plaintiff's past relevant work and all other competitive work (AR 60), the Court cannot find harmless the ALJ's failure adequately to consider plaintiff's testimony and statements suggesting greater limitations.

## V. CONCLUSION

For the foregoing reasons,[9] the decision of the Commissioner of Social Security is REVERSED in part, and this matter is REMANDED for further administrative action consistent with this Opinion.[10]

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: February 21, 2023

/s/
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

---

[9] The Court need not, and has not adjudicated plaintiff's other challenges to the ALJ's decision, except insofar as to determine that a reversal and remand for immediate payment of benefits would not be appropriate. On remand, however, the Commissioner may wish to develop the record concerning plaintiff's alleged cognitive limits by obtaining a medical opinion regarding the same since none of the qualifying medical opinions currently in the record appears to have evaluated plaintiff's cognitive limitations. See 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (defining medical opinions). Specifically, Dr. Karamlou did not evaluate plaintiff's memory or cognition as part of his examination or opine whether plaintiff would have any mental limitations, but did find that plaintiff has brain fog and poor attention/concentration related to his TIAs. (AR 976-80). The state agency physicians considered Dr. Karamlou's opinion and plaintiff's complaints of brain fog, and poor attention and concentration due to TIAs in determining plaintiff's residual functional capacity, but did not assess any mental limitations citing the lack of evidence of any significant deficits from plaintiff's TIAs, and Dr. Luh's January 29, 2019 treatment note reporting that plaintiff's memory was not impaired to general conversation. (AR 70, 72, 82, 85 (citing AR 989-91)).

[10] When a court reverses an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and quotations omitted); Treichler, 775 F.3d at 1099 (noting such "ordinary remand rule" applies in Social Security cases) (citations omitted).